

# NUMBER 13-18-00001-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RAYMOND R. FULP, III, D.O.,                                        Appellant,

v.

JOHN PETITTA,                                                             Appellee.

## On appeal from the 92nd District Court
## of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Contreras, Longoria, and Hinojosa
### Memorandum Opinion by Justice Hinojosa

This is an interlocutory appeal of the trial court's order denying appellant Raymond R. Fulp, III, D.O.'s (Fulp) motion to dismiss the healthcare liability claims of appellee John Petitta.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(9), 74.351(a), (b) (West, Westlaw through 2017 1st C.S.).   In one issue, Fulp contends that the trial court abused its discretion in overruling his objections to the report of Keith D. Bjork, M.D. and denying

dismissal.   We affirm.

## I. BACKGROUND

Fulp performed a right total knee replacement, a surgical procedure requiring the implantation of a prosthesis, on Petitta on November 13, 2014.   After Petitta's discharge from the hospital, Javier Barbosa, a physician assistant presumably supervised by Fulp,[1] provided Petitta with post-operative follow up care.   At Petitta's first two follow-up visits, Barbosa noted that Petitta's surgical wound was healing with no apparent problems.   At Petitta's third follow-up visit, which occurred approximately twenty-five days after Petitta's knee replacement, Barbosa noted that there was clear drainage.   At Petitta's fourth follow-up visit, Barbosa noted that Petitta had a low-grade fever and chills, his knee was warm to the touch, and it had gross purulence or pus consistent with an infection. Barbosa instructed Petitta to go to the hospital, and he was admitted to the hospital through its emergency department.

On December 17, 2014, the day after being admitted to the hospital, Fulp performed the surgical procedures of irrigation, debridement, and placement of antibiotic beads on Petitta's right knee.   Cultures from Petitta's wound and blood confirmed the presence of a Methicillin-Resistant Staphylococcus Aureus (MRSA) infection.   On three other occasions, Fulp and another orthopedic surgeon performed similar surgeries on Petitta's right knee.

Petitta remained hospitalized until January 2, 2015, when he was discharged from the hospital and admitted into a long-term acute care facility.   There, Fulp performed four

---

[1] *See* TEX. OCC. CODE ANN. § 204.204(a) (West, Westlaw through 2017 1st C.S.) ("A physician assistant shall be supervised by a supervising physician.")

2

more surgeries on Petitta's right knee.

On September 1, 2015, Petitta visited with Barbosa to complain of severe pain, some chills, and night sweats. Barbosa ordered blood tests and asked Petitta to return to the office within a couple of days. Instead, Petitta was hospitalized again. The day after Petitta's office visit with Barbosa, Fulp removed the primary components in Petitta's right knee. The following month, Fulp performed a second total knee replacement on Petitta's right knee. Nevertheless, Petitta's right knee continued to deteriorate to the point where he developed osteomyelitis, an infection in the bone, and ligament instability.

Ultimately, Fulp referred Petitta to Creighton Tubbs, M.D., an orthopedic surgeon at the San Antonio Military Medical Center. Tubbs performed a two-stage revision surgery. First, on May 6, 2016, he removed the infected prosthesis and cut out the infected bone. Second, on July 28, 2016, he installed a new prosthesis.

Petitta asserted health care liability claims against, among others, Fulp. Petitta alleged that Fulp was negligent because he failed to timely, adequately, and appropriately treat the infection in his right knee. Petitta's original petition elaborates that Fulp left the prosthesis in place through numerous surgeries and that such dereliction allowed the infection to spread to a nearby bone. According to Petitta, had Fulp removed the prosthesis earlier, Petitta would not have undergone several surgeries and months of treatment.

Petitta filed a report dated April 18, 2017 by Keith D. Bjork, M.D., an orthopedic surgeon. Fulp objected to Bjork's report and moved to dismiss. Petitta filed a response to Fulp's objections and sought, in the alternative, a thirty-day extension to cure any

3

potential deficiencies. According to the docket sheet, the parties reached an agreement regarding Fulp's objections. Thereafter, the trial court signed an order memorializing that it had considered Fulp's motion to dismiss and Petitta's alternative motion for a thirty-day extension and granting Petitta a thirty-day extension to cure any deficiencies raised in Fulp's motion to dismiss. Petitta then served Fulp with a second report dated June 28, 2017 by Bjork (Bjork's report). As before, Fulp objected to Bjork's second report and moved to dismiss. The trial court overruled Fulp's objections and denied his motion to dismiss. This appeal followed.

## II. DISCUSSION

On appeal, Fulp complains about Bjork's opinions regarding all three statutory elements—standard of care, breach, and causation.

### A. General Authority & Standard of Review

An "expert report" is a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6). When a report and CV are timely served on a defendant, any objections to the sufficiency of the report must be raised by the defendant within 21 days after service of the report and CV. *Id.* §74.351(a).

A trial court's ruling on the sufficiency of an expert's report is reviewed for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). Under this review, we defer to the trial court's factual determinations if they are supported

4

by the evidence, but review its legal determinations de novo. *Id.* A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Id.* However, in exercising its discretion, it is incumbent upon the trial court to review the reports, sort out their content, resolve any inconsistencies, and decide whether the reports demonstrate a good faith effort to show that the plaintiff's claims have merit. *Id.* at 144; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report . . . .").

## B. Expert Report Elements

### 1. Standard of Care and Breach

Fulp's objection in the trial court to the standard of care and breach opinions contained in Bjork's report, which spanned five single-spaced pages, provides, in its entirety, that Bjork's report "fails to specifically set out the applicable standards of care for [him], as opposed to Dr. Burke's [sic] recitations of contradictions or his opinions as to what would be prudent." Petitta responded by directing the trial court to a specific passage in Bjork's report. The passage highlighted by Petitta provides the following:

> Once Mr. Petitta developed the MRSA infection in his right knee, Dr. Fulp had to treat the infection with multiple irrigation/debridement and antibiotic bead placement procedures. While those were appropriate when infection is acute, occurring in the first 4–6 weeks after the implantation, the longer the infection has been present, the harder it is to cure it without removing the implant. With an infection present longer than that, the generally accepted standard of care for treating chronic infection requires the orthopedic surgeon to perform a two-stage surgical procedure.
> [¶]     In the first procedure, the implant is removed, the infected area is irrigated and debrided, an antibiotic cement spacer is placed into the joint—

5

to keep the normal joint space and alignment and the patient is treated with IV antibiotics for approximately 6–8 weeks. Once the infection is deemed eradicated—as evidenced by negative cultures obtained by standard knee aspiration, the second stage procedure involves removing the antibiotic cement spacer, repeat irrigation and debridement of the area and implantation of the new revision implant.

[¶]  Dr. Fulp waited almost 9 months to completely remove the primary prosthesis when a deep infection was almost certainly established in and around the prosthesis.  Dr. Fulp deviated from generally accepted standards of care involving the early removal of all components once a deep infection was established.  In hindsight, Dr. Fulp's failure to remove the implant earlier and perform a two-stage revision surgery described, with reasonable medical probability contributed to Mr. Petitta's persistent infection.  In fact, multiple surgeries did not resolve the infection in late 2014 and early 2015 and Mr. Petitta ultimately developed osteomyelitis—a serious deep bone infection.

(Paragraph breaks added).    On appeal, Fulp asserts that Bjork's report fails to satisfy the standard of care and breach elements in four interrelated ways.   Assuming without deciding that Fulp presented the trial court with non-conclusory, non-vague, and sufficiently specific objections to preserve the complaints he makes on appeal, we turn to each of Fulp's appellate arguments.

First, Fulp contends that he performed the two-stage surgical plan articulated by Bjork as the standard of care.   Fulp notes that on September 2, 2015, he removed the prosthesis; and that on October 23, 2015, he performed a revised total knee replacement. Therefore, Fulp implicitly posits that Bjork's report presents no opinion as to breach. Second, Fulp faults Bjork's use of the phrase "early removal" of the prosthesis as undefined.   "Early removal" could mean, according to Fulp, hours, days, weeks, months or years.   Third, Fulp faults Bjork's use of the phrase "deep infection" as undefined.   Fulp contends that Bjork fails to explain what "deep infection" means and when it developed. Fourth, focusing on the timing of Petitta's infection, Fulp argues that Bjork's report "is

6

entirely devoid of any opinions as to whether the infection was eradicated when Dr. Fulp revised the total knee on 10/23/2015 and is silent as to whether the problems Mr. Pettita had after the first revision were due to any alleged delay with the first removal." Fulp uses the course of care provided by Tubbs to cast doubt on Bjork's standard of care opinions by arguing the following:

> why was it okay for Dr. Tubbs to leave in this revised knee from 10/23/2015 (when implanted) until 05/06/2016 (when Dr. Tubbs removed the components)? Dr. Bjork had no complaints about the treatment provided by Dr. Tubbs. This was approximately 6 ½ months later—long after the 4-6 weeks Dr. Bjork finds to be clearly appropriate.

(citation and footnote omitted).

Fulp's first two arguments fail because Bjork's standard of care opinion contains a timeframe, and Fulp acted outside that timeframe. Bjork's report patently provides that an acute infection, occurring in the first four-to-six weeks after implantation, may be appropriately treated with irrigation, debridement, and antibiotic bead placement procedures. However, "the longer the infection has been present, the harder it is to cure it without removing the implant. With an infection present longer than that, the generally accepted standard of care for treating chronic infection requires" a two-stage surgical procedure. The trial court is tasked with, among other things, reading all of Bjork's report, sorting out its content, and resolving any inconsistencies. *Van Ness*, 461 S.W.3d at 144. The preceding passage provides that after a four-to-six-week period, an infection such as Petitta's is reclassified from acute to chronic. Under this standard of care, the infection in Petitta's right knee became chronic, and therefore necessitated removal of the prosthesis, on December 25, 2014, six weeks after Fulp implanted it. Instead, the

7

prosthesis remained in place until September 2, 2015. Comparatively, December 25, 2014 is approximately nine months "earlier" than September 2, 2015. Thus, the phrase "early removal" that Fulp isolates is no cause for confusion. Indeed, Fulp apparently comprehends Bjork's standard of care opinion because he faults Tubbs for allegedly failing to adhere to it and delaying in removing the prosthesis Fulp installed for a second time.

Fulp's third argument, in which he isolates and criticizes the phrase "deep infection," is a similar semantic distraction. Bjork's report explains that at the beginning of 2015 the infection in Petitta's right knee should have been classified as chronic and necessitated removal of the original prothesis. Reading all of Bjork's report, we observe that he uses the terms "chronic" and "deep infection" interchangeably. The lack of a specific definition for the term "deep infection" does not render the opinion insufficient.

Fulp's fourth argument criticizes Bjork's report for not definitively stating whether the infection in Petitta's right knee persisted through the September 2, 2015 revision surgery. Fulp's fourth argument labors under the misunderstanding that Bjork's report is required to speak as to each and every liability theory asserted by Petitta. "A report that satisfies these requirements [by addressing the elements articulated in section 74.351(r)(6)], even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013).

In the facts section of Petitta's petition, he chronicles how in the months of December 2014 and January 2015, Fulp performed eight surgeries, "[y]et, [he] never

8

removed the prosthesis." Then, on September 1, 2015, Petitta presented to Barbosa with an infection to his right knee that resulted in his being hospitalized for the second time due to such an infection. In the causes of action section of Petitta's original petition, he alleges that "[h]ad [Fulp] removed the prosthesis earlier, [Petitta] would not have undergone several surgeries, and suffer from the costs, mental anguish, and pain and suffering associated with many months of treatment." Petitta's negligence theory relating to the eight surgeries performed from December 2014 through January 2015 is supported by Bjork's standard of care opinion, which provides a fair summary as noted above, and his breach opinion, which explains how Fulp failed to meet the standard as noted above. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Potts*, 392 S.W.3d at 630. Thus, Bjork's report need not have addressed Petitta's other negligence theory to permit his suit to continue.

### 2. Causation

Fulp's objections in the trial court to the causation opinions in Bjork's report provide, in their entirety, that it "fails to identify and adequately explain an intelligent non-conclusory causal link between the alleged vague breaches of the standard of care by [Fulp] and Plaintiff's alleged injuries and damages. Instead, the amended report contains only conclusory statements regarding causation by Dr. Bjork." Petitta responded by directing the trial court to the specific passage in Bjork's report noted in the preceding subsection regarding the standard of care and breach elements. Petitta also directed the trial court to an additional passage in Bjork's report that provides the following:

9

In my opinion, [Petitta's] early signs of infection should have been more aggressively diagnosed and treated, and the components should have been removed much sooner than 9 months. . . Once the infection was deep, established, and in the bone, it is difficult to control and eradicate no matter what is done. In my opinion, a more definitive early diagnosis and more aggressive treatment early in the course of this case—in reasonable medical probability would have prevented this serious knee infection. Although infection can occur despite the best of care, all steps possible must be taken to prevent and treat the infection before it becomes established.

On appeal, Fulp asserts that Bjork's report fails to satisfy the causation element in three ways. Assuming without deciding that Fulp presented the trial court with non-conclusory, non-vague, and sufficiently specific objections to preserve the complaints he makes on appeal, we turn to each of Fulp's appellate arguments.

First, Fulp complains that Bjork does not specify a particular injury that he caused. According to Fulp, "at best" Bjork opines that his alleged negligence "contributed to [Petitta's] persistent infection." Second, as with the standard of care and breach elements, Fulp complains that Bjork fails to state that Petitta's right knee was infected when he installed a new prosthesis on October 23, 2015. Third, Fulp assails Bjork's opinions wherein he states, "In hindsight, Dr. Fulp's failure to remove the implant earlier and perform a two-stage revision surgery described, with reasonable medical probability contributed to Mr. Petitta's persistent infection." According to Fulp, he performed the two-stage revision.

As to Fulp's first argument, Bjork opined that Fulp's alleged negligence "contributed to [Petitta's] persistent infection" and that "multiple surgeries did not resolve the infection in late 2014 and early 2015." As elucidated in Petitta's petition, he seeks damages for the alleged medical expenses, mental anguish, pain, and suffering

10

associated with those multiple surgeries. According to Bjork, had the prosthesis been removed on December 25, 2014, Petitta would not have battled "an infection longer than" "4–6 weeks" that made it "harder [] to cure." Fulp's second argument fails for the same reason its counterpart failed in the preceding subsection, because a report that satisfies the elements articulated in section 74.351(r)(6) as to one theory only entitles the claimant to proceed with a suit against the physician or health care provider. *See Potts*, 392 S.W.3d at 630. Therefore, Bjork's report needed to only articulate a causation opinion as to the period from late 2014 and early 2015. Lastly, Fulp's complaint that he fulfilled the standard of care articulated by Bjork because he ultimately performed a two-stage revision fails to appreciate the timeframe espoused by Bjork.

### 3. Holding

For the aforementioned reasons, we cannot say that the trial court abused its discretion in overruling the objections Fulp lodged against Bjork's report and denying Fulp's motion to dismiss. *See Van Ness*, 461 S.W.3d at 144. Furthermore, even had Fulp articulated the complaints he has raised on appeal to the trial court, we still cannot say that it abused its discretion in denying dismissal. *See id.* Fulp's sole issue is overruled.

### III. CONCLUSION

We affirm the trial court's order.

LETICIA HINOJOSA
Justice

Delivered and filed the
31st day of August, 2018.

11